CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

NOV - 9 2006

JOHN F. CORCORAN, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

| | | |
|---|---|---|
| **CLARA DARLENE HICKMAN,** | ) | **MEMORANDUM OPINION** |
| Plaintiff, | ) | Civil Action No.: 1:05cv00049 |
| v. | ) | |
| **LABORATORY CORPORATION OF AMERICA HOLDINGS, INC.** | ) | By: GLEN M. WILLIAMS |
| Defendant. | ) | Senior United States District Judge |

Clara Darlene Hickman originally brought this suit against the defendant, Laboratory Corporation of America Holdings, Inc., ("LabCorp"), for negligence, intentional and outrageous conduct, breach of warranty, negligent misrepresentation, medical malpractice and punitive damages. Thereafter, by an Order, (Docket Item No. 19), and accompanying Memorandum Opinion, (Docket Item No. 18), entered October 6, 2005, this court dismissed the claims of intentional and outrageous conduct, breach of implied warranty, negligent misrepresentation and medical malpractice. This matter is currently before the court on LabCorp's Motion for Summary Judgment, (Docket Item No. 73) ("the Motion"), which was filed on August 24, 2006. This court has jurisdiction pursuant to 28 U.S.C. §§ 1332 and 1441.

On October 6, 2006, United States Magistrate Judge Pamela Meade Sargent entered a Report and Recommendation, (Docket Item No. 93) ("Report"), recommending that the defendant's Motion be granted as to Hickman's remaining

claims. Consequently, on October 13, 2006, Hickman timely filed objections to the Report. (*See* Docket Item No. 95, Plaintiff's Objections to the Magistrate's Recommendations). The facts, as stated in Judge Sargent's Report, will be adopted for the purposes of this opinion.

While I concur with Judge Sargent's recommendations and affirm her findings of fact, I am of the opinion that the Supreme Court of Virginia's rulings in *Hughes v. Moore*, 197 S.E.2d 214 (Va. 1973), and *Myseros v Sissler*, 387 S.E.2d 463 (Va. 1990), can be reconciled and are, in fact, distinguishable, with the case at hand being more factually similar to the court's more recent ruling in *Myseros*.[1] Thus, I will take this opportunity to further discuss the distinction between *Hughes* and *Myseros*, and articulate why the plaintiff's claims are more closely akin to the facts and analysis set forth in *Myseros*.

## *Discussion*

Throughout the years, the law regarding the right to recover for an emotional disturbance, or its physical consequences, has evolved. In *Bowles v. May*, 166 S.E. 550, 555 (Va. 1932), the Supreme Court of Virginia stated that "there can be no recovery for mental anguish and suffering resulting from negligence unaccompanied by contemporaneous physical injuries to the person." The court also explained that an attempt to recover damages based upon an emotional disturbance "falls within a class which is not favored." *Bowles*, 166 S.E. at 557. While the court recognized that

---

[1]Since the court is affirming Judge Sargent's Report and findings of fact, it will not specifically address the breach of warranty issue.

-2-

"the possible success of unrighteous or groundless actions should not bar recovery in a meritorious case," it also clearly voiced concern that the fright or mental shock associated with an emotional disturbance claim can "be so easily feigned without detection." *Bowles*, 166 S.E. at 557. Therefore, the court ruled that recovery for an emotional disturbance should not be permitted in a doubtful case, and "[t]he plaintiff should be required to prove by clear and convincing evidence, (1) the commission of the wrongful act, and (2) a chain of unbroken causal connection between the alleged act and the physical injury." *Bowles*, 166 S.E. at 557. Thus, according to *Bowles*, when determining whether recovery is available for emotional damages in a case where there was no accompanying contemporaneous physical contact, the court should evaluate each case based upon its own particular facts.

More than thirty years after the Supreme Court of Virginia's holding in *Bowles*, the court was once again faced with the issue of recovery for emotional damages where no physical contact occurred. In *Hughes*, the plaintiff was standing in a doorway looking out a window, when she heard a loud noise and saw the headlights of a vehicle shining into her home. 197 S.E.2d at 215. The defendant, who had lost control of his vehicle, crashed into the front porch of the home. *Hughes*, 197 S.E.2d at 215. According to the plaintiff, as the vehicle approached, she was "'froze[n] in her tracks'" and screamed. *Hughes*, 197 S.E.2d at 215. Moreover, the plaintiff alleged that she *immediately* became weak and "felt as if her legs were going to fold under her." *Hughes*, 197 S.E.2d at 215 (emphasis added). The plaintiff also alleged that, as a result of the accident, she developed nervousness, suffered chest and arm pains and was unable to sleep the night of the accident. *Hughes*, 197 S.E.2d at 215. While the plaintiff did not suffer from an immediate physical or contemporaneous

contact, shortly after the accident she was unable to breast feed her three-month old child and her menstrual cycle unexpectedly began. *Hughes*, 197 S.E.2d at 215.

Furthermore, in *Hughes*, the court referenced its previous ruling in *Bowles* and also examined the development of the "impact rule." *See Hughes*, 197 S.E.2d at 216-20. Essentially, the impact rule prohibited recovery for the physical results of emotional disturbance or mental anguish without impact. *See Hughes*, 197 S.E.2d at 218. As explained in *Hughes*, the rationale behind the impact rule was based upon three arguments: "(1) medical science's difficulty in proving causation between the claimed damages and the alleged fright; (2) the fear of fraudulent or exaggerated claims; and (3) concern that the absence of such a rule would precipitate a flood of litigation." 197 S.E.2d at 218. The Supreme Court of Virginia recognized that a large number of jurisdictions had chosen to "repudiate or not follow[]" the impact rule. *Hughes*, 197 S.E.2d at 218-19. In addition, the court commented that the rationale behind the impact rule was "not logical." *Hughes*, 197 S.E.2d at 219. Thus, in *Hughes*, the Supreme Court of Virginia took the opportunity to clarify its stance on the issue, and stated that

> [w]e adhere to the view that where conduct is merely negligent, not willful, wanton, or vindictive, and physical impact is lacking, there can be no recovery for emotional disturbance alone. We hold, however, that where the claim is for emotional disturbance *and* physical injury resulting therefrom, there may be recovery for negligent conduct, notwithstanding the lack of physical impact, provided the injured party properly pleads and proves by clear and convincing evidence that his physical injury was the natural result of fright or shock proximately caused by the defendant's negligence. In other words, there may be recovery in such a case if, but only if, there is shown a clear and unbroken chain of causal

-4-

connection between the negligent act, the emotional disturbance, and the physical injury.

197 S.E.2d at 219. The court determined that "there was evidence that [the] plaintiff suffered physical injuries which were the natural result of the fright and shock proximately caused by [the] defendant's tortious conduct." *Hughes*, 197 S.E.2d at 220.

In *Myseros*, the Supreme Court of Virginia addressed the issue of whether a plaintiff had properly proven that he suffered a physical injury within the meaning of the standard set forth in *Hughes*. *See Myseros*, 387 S.E.2d at 464. In *Myseros*, the plaintiff was operating a tank truck containing a large quantity of gasoline when his truck was hit by another vehicle. 387 S.E.2d at 464. The plaintiff felt the collision and heard the sound of "'metal hitting metal.'" *Myseros*, 387 S.E.2d at 464. Because his vehicle had been struck, he brought the truck to a stop in the traffic lane in which he had been traveling and inspected it for gas leaks. *Myseros*, 387 S.E.2d at 464. At this point, a car "'came right at [the plaintiff]'" and he was forced to run into the median to avoid being hit. *Myseros*, 387 S.E.2d at 464. He again attempted to inspect his truck, but was forced twice more into the median. *Myseros*, 387 S.E.2d at 464. The truck was minimally damaged and the plaintiff did not suffer any immediate physical injuries or contemporaneous contact. *Myseros*, 387 S.E.2d 465.

However, when he reported to work two days later, he claimed that he felt "'scared'" and "'was nervous, sweaty, [and] dizzy.'" *Myseros*, 387 S.E.2d at 465. He alleged that, because of these problems, his work supervisor sent him home. *Myseros*, 387 S.E.2d at 465. Shortly thereafter, the plaintiff was placed under

-5-

psychiatric care and was diagnosed with post-traumatic stress disorder, which had evolved into a generalized anxiety disorder with some depressive features and a phobic reaction. *Myseros*, 387 S.E.2d at 465. In addition, the plaintiff's disorder was accompanied by "sweating, dizziness, nausea, difficultly in sleeping and breathing, constriction of the coronary vessels, two episodes of chest pain, hypertension, unstable angina, an electrocardiogram showing marked ischemia, loss of appetite and weight, change in heart function, and problems with the heart muscle." *Myseros*, 387 S.E.2d at 465. The court ruled that "[w]hat *Hughes v. Moore* requires . . . and what this case lacks, is clear and convincing evidence of 'symptoms' or 'manifestations' of *physical injury*, not merely of an underlying emotional disturbance." *Myseros*, 387 S.E.2d at 466. In sum, the court held that the plaintiff had simply proven typical symptoms of an emotional disturbance, which are not recoverable under *Hughes* in the "absence of resulting physical injury." *Myseros*, 387 S.E.2d at 466.

Based upon the factual scenarios in *Hughes* and *Myseros*, Judge Sargent opined that there is not a clear distinction between the reasoning and analysis of the two cases. Viewing the court's rulings as "two competing precedents," Judge Sargent contended that the two rulings were irreconcilable. (*See* Report at 11.) Specifically, Judge Sargent stated that,

> [b]ased on the similarity of the symptoms in [*Hughes* and *Myseros*], this court cannot understand the Supreme Court of Virginia's ruling that the plaintiff in *Hughes* provided "clear and convincing evidence of 'symptoms' or 'manifestations' of *physical injury*," but that the plaintiff in *Myseros* had proven only "typical symptoms of an emotional disturbance" not rising to the level of a physical injury.

(*See* Report at 10.) Thus, Judge Sargent recommended that this court adhere to

-6-

*Myseros*, the Supreme Court of Virginia's most recent pronouncement on the issue. (*See* Report 11-12.)

While I agree with Judge Sargent's recommendation and findings of fact, I am of the opinion that these two cases are reconcilable, and that the facts before the court are analogous to those in *Myseros*. I recognize that there is not a clear distinction based upon a comparison of the facts of *Hughes* and *Myseros*. However, I contend that the distinguishing factors between the two rulings lies in three specific areas: (1) the proof offered through the statements of medical experts; (2) the fact that, in *Hughes*, the plaintiff's alleged injuries were more contemporaneous and immediate than the alleged injuries in *Myseros*; and (3) the fact that the *Myseros* case involved an intervening cause. In discussing these three areas, I will demonstrate the differences between *Hughes* and *Myseros* and explain why the Supreme Court of Virginia's ruling in *Myseros* is controlling in this case.

### I. Proof Offered by Medical Experts

In both *Hughes* and *Myseros*, the Supreme Court of Virginia turned to medical testimony to assist in determining whether or not the plaintiff had met the appropriate burden of proof. In *Hughes*, a medical expert clearly stated that the pain experienced by the plaintiff was a result of the "emotional disturbance and that her condition presented a serious mental problem." 197 S.E.2d at 216. Moreover, the plaintiff's medical expert in *Hughes* opined that there was a "causal connection" between the defendant's tortious conduct and the plaintiff's emotional and physical condition. 197 S.E.2d at 216. Thus, the court found that the plaintiff had produced sufficient

evidence, which demonstrated that the physical injuries suffered were the proximate cause of the defendant's tortious conduct. 197 S.E.2d at 220.

Conversely, in *Myseros*, the plaintiff's doctors did not plainly state that there was a connection between the defendant's tortious conduct and the plaintiff's condition. 387 S.E.2d at 465. Instead, the medical testimony merely indicated that the plaintiff was suffering from symptoms or manifestations of an underlying emotional disturbance. *Myseros*, 387 S.E.2d at 466. In particular, the plaintiff's psychiatric witnesses noted that the plaintiff's "'symptoms [were] consistent with a pattern of high level *anxiety*.'" *Myseros*, 387 S.E.2d at 465. Furthermore, when the doctor was asked about the relationship of the accident to the plaintiff's physical problems, the doctor stated that symptoms such as chest pain, headaches and dizziness amounted to "'typical ... *manifestations* of *anxiety*.'" *Myseros*, 387 S.E.2d at 465.

The plaintiff's other psychiatric witness testified that the plaintiff did describe symptoms of panic attacks, and that "what [the plaintiff] was experiencing 'are parts of the *symptoms* which made up his problem.'" *Myseros*, 387 S.E.2d at 465. However, the court noted that the doctor did not indicate that the plaintiff's problem consisted of a physical injury. *Myseros*, 387 S.E.2d at 465. Consequently, the court ruled that the plaintiff had simply shown symptoms or manifestations of an underlying emotional disturbance, and had failed to present clear and convincing evidence of symptoms or manifestations of physical injury. *Myseros*, 387 S.E.2d at 466.

-8-

Case 1:05-cv-00049-GMW-PMS   Document 98   Filed 11/09/06   Page 8 of 18   Pageid#: 1104

Here, Hickman's doctors stated that Hickman experienced symptoms of anxiety and stress, such as hair loss, fatigue, nervousness, lack of focus, irritability and anxiousness. Specifically, when questioned about Hickman's symptoms, Dr. Gail Stanley, M.D., stated that "[s]tress causes alopecia," or hair loss. (Deposition of Dr. Gail Stanley, M.D., Docket Item No. 74, Exh. 2, ("Stanley Deposition"), at 109.) Furthermore, Dr. Stanley noted that "emotional stress [and] psychological problems can cause physical ailments," and that "there are many physical manifestations of stress and depression." (Stanley Deposition at 109-10.) Dr. William Diebold, M.D., Hickman's psychiatrist, explained that Hickman "generally [felt] nervous or anxious the majority of the time." (Deposition of Dr. William Diebold, M.D., Docket No. 74, Exh. 3, ("Diebold Deposition"), at 26.) In addition, Dr. Diebold opined that many of Hickman's symptoms were a result of depression and anxiety. (Diebold Deposition at 34, 44-47.) At no point, in the excerpts of the depositions provided to the court, did either doctor clearly state that Hickman's alleged physical injuries were a result of the erroneous HIV test report. Similarly, neither doctor clearly stated that Hickman's symptoms amounted to a physical injury. Instead, the doctors explained that Hickman's problems were typical symptoms of stress, anxiety and depression.

Just as in *Myseros*, the medical evidence here does not show clear and convincing proof of symptoms or manifestations of a physical injury. This court recognizes that a false-positive HIV test result would undoubtedly be a traumatic experience for anyone. However, based upon the standard set forth in *Hughes*, in order to recover for damages in the absence of physical impact, the injured party must properly plead and prove by "clear and convincing evidence that his physical injury was the natural result of fright or shock proximately caused by the defendant's

Case 1:05-cv-00049-GMW-PMS   Document 98   Filed 11/09/06   Page 9 of 18   Pageid#: 1105

negligence." 197 S.E.2d at 219. Here, although the plaintiff alleges symptoms that one would reasonably expect in this situation, the plaintiff has failed to prove, by clear and convincing evidence, that physical injuries occurred, and that receiving the false-positive HIV test result was the proximate cause of those injuries. The plaintiff's doctors simply opine that Hickman suffered from stress, anxiety and depression, which often leads to physical manifestations. The doctors did not unequivocally state that there was a "causal connection" between Hickman's injuries and LabCorp's tortious conduct.

Just prior to the hearing on the Motion for Summary Judgment before Judge Sargent, Hickman filed affidavits from Dr. William Handy, M.D., Hickman's employer, and Dr. Diebold, in an attempt to demonstrate that a physical injury occurred and that there was a causal link between the erroneous HIV test result and the alleged symptoms or injuries. (*See* Affidavit of Dr. William Handy, M.D., Docket Item No. 76, and Affidavit of Dr. William Diebold, Docket Item No. 78). LabCorp promptly filed motions to strike the affidavits; however, the motions were never ruled upon.

In this opinion, the court did not consider the affidavits of Dr. Handy and Dr. Diebold. Pursuant to Federal Rule of Civil Procedure 26(a)(2)(B), the plaintiff must disclose "a complete statement of opinions to be expressed" for each expert witness. This disclosure must be made at least ninety days prior to the trial date. FED. R. CIV. P. 26(a)(2)(C). According to Federal Rule of Civil Procedure 37(c)(1), "[a] party that without substantial justification fails to disclose information required by Rule 26(a) . . . is not, unless such failure is harmless, permitted to use as evidence at trial, at a

hearing, or on a motion any witness or information not so disclosed." Here, Dr. Handy's affidavit was filed one day prior to the Motion for Summary Judgment hearing and within ninety days of the set trial date. The affidavit was the first disclosure of any type regarding Dr. Handy's expert opinion. Thus, since the disclosure of Dr. Handy's opinion was not timely, the affidavit was not considered.

Dr. Diebold's affidavit, which was filed only three days prior to the Motion for Summary Judgment hearing, was simply an attempt to add information that Dr. Diebold failed to provide in his sworn deposition. In the excerpts of the deposition provided to the court, Dr. Diebold had ample opportunity to specifically state that Hickman's symptoms or injuries were physical injuries. Likewise, Dr. Diebold had the opportunity to clearly state that the alleged symptoms or injuries were caused by the erroneous HIV test result.

In *Rohrbough v. Wyeth Labs., Inc.*, 916 F.2d 970, 976 (4th Cir. 1990), the Fourth Circuit held that the affidavit of an expert, which added to and contradicted his prior deposition, was insufficient to establish a genuine issue of material fact. Similarly, in *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984) (citing *Perma Research and Dev. Co. v. Singer*, 410 F.2d 572, 578 (2d Cir. 1969)), the court determined that a contradictory affidavit should be disregarded and explained, "'[i]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.'" Thus, Dr. Diebold's affidavit was not considered.

-11-

Case 1:05-cv-00049-GMW-PMS   Document 98   Filed 11/09/06   Page 11 of 18   Pageid#: 1107

Furthermore, the affidavits offered by Hickman were conclusory and devoid of specific facts to support the opinions. Nonetheless, even if this court had considered the affidavits of Dr. Handy and Dr. Diebold, it would not have impacted the court's analysis regarding the contemporaneousness of Hickman's alleged injuries, or the fact that there was a possible intervening cause.

## II. Contemporaneousness of the Alleged Injuries

In Virginia, it is clear that recovery is prohibited for emotional damages resulting from negligence in cases that do not involve a willful, wanton or vindictive act, *unless* there has been a contemporaneous physical injury. *Bowles*, 166 S.E. at 555. Virginia law has also established that, in the absence of a contemporaneous physical injury, recovery is permissible for emotional damages if the plaintiff can demonstrate, by clear and convincing evidence, that the physical injury resulted from "a clear and unbroken chain of causal connection between the negligent act, the emotional disturbance, and the physical injury." *Hughes*, 197 S.E.2d at 219.

*Hughes* can easily be distinguished from *Myseros* when one looks at the contemporaneousness of the alleged injuries. In *Hughes*, when the plaintiff saw the vehicle approaching her home, she alleged that she was immediately shocked and startled by the event. 197 S.E.2d at 215. Furthermore, as stated earlier, the facts in *Hughes* indicate that "[i]mmediately thereafter she became weak and felt as if her legs were going to fold under her." 197 S.E.2d at 215. As a result of the collision, the plaintiff also allegedly experienced immediate physical manifestations. *Hughes*, 197 S.E.2d at 215. Therefore, the plaintiff suffered contemporaneous injuries that were

the result of the defendant's tortious conduct.

Conversely, the plaintiff in *Myseros* did not suffer immediate injury. 387 S.E.2d at 465. Instead, the plaintiff's alleged injuries and symptoms were caused by vehicles driven by people other than the defendant, as well as the plaintiff's unreasonable decision to inspect his vehicle in close proximity to the moving traffic. *Myseros*, 387 S.E.2d at 464-65. Unlike *Hughes*, where the plaintiff suffered an immediate or contemporaneous injury, the plaintiff in *Myseros* suffered from symptoms or injuries that were not realized or reported until two days following the accident. *Myseros*, 387 S.E.2d at 465. Thus, it is obvious that there was a significant time lapse between the collision and the realization of the symptoms or injuries.

While receiving a false-positive HIV test is surely a traumatic experience, the evidence in this case does not present a factual situation like that shown in *Hughes*, where the plaintiff alleged simultaneous or contemporaneous injury and shock. 197 S.E.2d at 215. Here, after receiving the results, Hickman was placed under the care of infectious disease specialist, Dr. Stanley. Once under Dr. Stanley's care, further testing was ordered to assist in determining future treatment plans. After being treated by Dr. Stanley, Hickman sought psychiatric care from Dr. Diebold, who diagnosed Hickman with generalized anxiety disorder and prescribed her medication for depression and anxiety. There is nothing in the record to precisely indicate when Hickman's symptoms began. Thus, the symptoms could have occurred contemporaneously, or they could have occurred days following the erroneous HIV test report. Although Hickman sought medical care shortly after receiving the false-positive HIV test result, her alleged symptoms and injuries were not shown to arise

-13-

in a contemporaneous manner. Therefore, Hickman has failed to plead and prove, by clear and convincing evidence, that an immediate or contemporaneous injury occurred.

When comparing the characteristics of the injuries alleged in *Hughes* and *Myseros*, it is necessary to address another key distinction. The injuries alleged in *Myseros*, and in this case, consist solely of symptoms or manifestations of emotional disturbances such as stress, anxiety and depression. 387 S.E.2d at 466. Conversely, in *Hughes*, the physical injuries experienced were the type of injuries one would not normally associate with mental anguish. There, the plaintiff suffered from actual physical injuries, separate from the emotional disturbance, that resulted from the shock caused by the defendant's tortious conduct. *Hughes*, 197 S.E.2d at 215.

### III. Intervening Cause

Under Virginia tort law, it is well-established that a person is responsible for injuries caused by his or her negligence, even if the acts of others contributed to the injuries, unless those acts create an intervening, superceding cause of the injury. *See Coleman v. Blankenship Oil Corp.*, 267 S.E.2d 143, 147 (Va. 1980); *Von Roy v. Whitescarver*, 89 S.E.2d 346, 352 (Va. 1955). "Thus, a superceding cause of an injury 'constitutes a new effective cause and operates independently of any other act, making it[,] and it only[,] the proximate cause of injury.'" *Jenkins v. Payne*, 465 S.E.2d 795, 799 (Va. 1996) (quoting *Maroulis v. Elliot*, 151 S.E.2d 339, 345 (Va. 1966)).

-14-

It must be noted that the factual situation in *Myseros* involved an intervening act or cause. *See* 387 S.E.2d at 464. In *Myseros*, the plaintiff's fright or shock was the result of his decision to exit his vehicle and position himself in close proximity to moving traffic. 387 S.E.2d at 464. Following the collision with the defendant, the plaintiff chose to exit his vehicle to inspect the damage to his truck. *Myseros*, 387 S.E.2d at 464. As a result, he was forced into the median multiple times to avoid being hit by oncoming traffic, which allegedly caused him to fear for his life. *Myseros*, 387 S.E.2d at 464. However, because the plaintiff's fright or shock was caused by other vehicles, the chain of causal connection was broken.

In the case at hand, as in *Myseros*, there were intervening causes or acts that could have independently caused Hickman's alleged symptoms and injuries. Despite receiving a positive HIV result, Hickman began attempting to conceive a child. In doing so, Hickman started taking prescription fertility drugs. Specifically, Hickman was prescribed Clomid, or clomiphene citrate. In clinical trials, nearly one percent of patients using Clomid experienced adverse impacts such as fatigue, hair loss, insomnia, nervous tension and weight gain/loss. PHYSICIANS' DESK REFERENCE 704 (59th ed. 2005). Moreover, adverse experiences such as anxiety, irritability, chest pain and palpitation were reported spontaneously with the use of Clomid. PHYSICIANS' DESK REFERENCE 704 (59th ed. 2005). Hickman alleges to have experienced each of these symptoms as the basis of her complaint.

Hickman also claims that after receiving the positive HIV result, she began smoking cigarettes due to the stress. However, medical studies indicate that nicotine from smoking acts as a stimulant, and can actually causes more symptoms of stress.

-15-

Parrott, A.C., *Does Cigarette Smoking Cause* Stress?, 54 AMERICAN PSYCHOLOGIST 817, 817-20 (1999); *See also* Smokefree.gov., http://smokefree.gov/pubs/FFree6.pdf (last visited November 1, 2006) (hereinafter "Smokefree.gov"); LifePositive.com, Causes of Stress, http://lifepositive.com/ Mind/ psychology/ stress/ causes-of-stress.asp (last visited October 23, 2006) (hereinafter "LifePostive.com"). Medical research also demonstrates that smoking does not provide mood control benefits; instead, it causes nicotine dependency which leads to heightened feelings of stress and depression in many smokers. *See* Smokefree.gov; LifePositive.com. The mood swing experienced by smokers occurs between nicotine intakes; thus, dependent smokers need nicotine to remain feeling normal. *See* Smokefree.gov; LifePositive.com. This repeated action equates to smokers "experienc[ing] a distinctly above-average level[] of daily stress." *See* LifePositive.com.

Although Hickman contends that she began taking Clomid and smoking after receiving the positive HIV result, there is no evidence that precisely identifies when Hickman undertook these activities. Thus, there is no way of determining whether or not Hickman smoked or took the fertility drug prior to the positive HIV result. Likewise, there is no way of determining whether these activities led to Hickman's symptoms, or if her alleged symptoms and injuries were the result of an unbroken causal chain that arose from the false-positive HIV test result.

Even though the Supreme Court of Virginia did not address the intervening cause issue in *Myseros*, it is clear from the facts that an intervening cause occurred. In *Myseros*, after the plaintiff's vehicle was hit by the defendant, the plaintiff broke the chain of causal connection when he unreasonably attempted to inspect his vehicle

-16-

in the midst of oncoming traffic; thus, creating an intervening cause.

Similarly, Hickman's actions of smoking and taking fertility drugs are intervening factors that could have caused the specific symptoms and injuries that Hickman allegedly suffered. Thus, it is possible that Hickman's actions "constitute[d] a new effective cause and operate[d] independently of [LabCorp's erroneous HIV report], making [her actions and her actions] only the proximate cause of the injury." *See Jenkins*, 465 S.E.2d at 799.

## Conclusion

Based upon the pleadings and evidence presented, there is no genuine issue as to material fact in this case. Hickman has failed to prove, by clear and convincing evidence, that she suffered a physical injury that was caused by LabCorp's tortious conduct. Hickman's medical experts failed to clearly state that (1) Hickman had suffered physical injuries; and (2) that those injuries were the result of an unbroken chain of causal connection between the negligent act, the alleged emotional disturbances and the alleged physical injuries. *See Hughes*, 197 S.E.2d at 219. Furthermore, Hickman also failed to prove that her alleged physical injuries were suffered in a contemporaneous manner. Lastly, based upon the evidence before the court, it is unclear whether Hickman's symptoms and injuries were the result of the erroneous HIV report, or the result of an intervening cause that independently caused the alleged symptoms or injuries, i.e., side effects associated with smoking cigarettes and taking the prescription drug Clomid.

-17-

Therefore, for the reasons stated above, I will affirm Judge Sargent's Report and findings of fact. Accordingly, the defendant's motion for summary judgment will be granted.

An appropriate order will be entered.

DATED: This 9th day of November, 2006

*[signature]*

THE HONORABLE GLEN M. WILLIAMS
SENIOR UNITED STATES DISTRICT JUDGE